IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CLEAN AIR SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:03-cv-944-TMP |
| | ) | |
| THE CENTECH GROUP, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

* * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| JOHN R. WHEELER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:04-cv-1179-TMP |
| | ) | |
| CLEAN AIR SYSTEMS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the separate motions for summary judgment filed by defendants, The Centech Group, Inc., ("Centech")[1] and Austin Air Systems, Ltd., ("Austin Air"), in 1:03-CV-944-TMP, and by plaintiff John R. Wheeler ("Wheeler") in 1:04-cv-1179-TMP.[2] Clean

---

[1] Centech filed what appears to be the same motion, albeit with different exhibits, three times in the instant case, according to the court's docket sheet. The motion, with differing attachments, was filed twice on August 25, 2005, and what appears to be the same motion was again filed on October 4, 2005. (See court documents 89, 90, and 123). For simplicity, the court refers to all relief sought by Centech as the same motion.

[2] Defendant Calhoun County, Alabama, also filed a motion for summary judgment, but the parties have notified the court that they have reached a settlement as between plaintiff Clean Air

Air Systems, Inc. ("Clean Air"), the plaintiff in 1:03-CV-944-TMP and the defendant in 1:04-cv-1179-TMP, has filed a response to the motions, and the moving parties have replied.  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  Having reviewed the arguments, evidence, and pleadings in this matter, the court finds that the motion filed by Centech is due to be denied in part and granted in part, that the motion by Wheeler is due to be denied, and that the motion by Austin Air is due to be granted.

## PROCEDURAL HISTORY

The plaintiff, Clean Air Systems, Inc., filed the complaint commencing this action on April 24, 2003.  The complaint asserts the following claims:

1.   That Centech breached its contract with Clean Air in that it failed and refused to utilize Clean Air as the supplier of portable room air cleaners ("PRACs") in connection with Centech's bid submitted to Calhoun County.

2.   That Centech fraudulently misrepresented several material facts related to its negotiations with the County.

3.   That Centech fraudulently suppressed material facts relating to its actions in negotiating with the County.

4.   That Austin Air intentionally and unjustifiably interfered with the business relationship between Clean Air and Centech.

---

Systems, Inc., and Calhoun County.  Accordingly, the court will deem Calhoun County's motion for summary judgment MOOT.  The amended complaint filed by plaintiff Clean Air on December 19, 2003, added a claim against Calhoun County, but otherwise was identical to the original complaint failed in this action.  Because plaintiff and Calhoun County have settled, the allegations of the amended complaint are not material to the resolution of these motions.

Motions to dismiss were filed by Centech and Austin Air, and on February 12, 2004, the court denied the motions to dismiss, but granted Centech's motion for a more definite statement of the fraud claim against it.  A second amended complaint was filed on March 9, 2004, setting forth additional statements of fact and providing more detail about the alleged fraudulent actions.  Centech filed an answer and counterclaim against Clean Air, adding as a counterclaim defendant Denny Barringer, asserting that Clean Air and Barringer defamed Centech in an email to County officials.  Austin Air filed an answer and cross-claim against Centech and Calhoun County, Alabama.  Both Calhoun County and Centech filed a motion to dismiss Austin Air's cross-claims, and those motions were granted by order dated November 22, 2004.

On June 4, 2004, John R. Wheeler, a vice president and employee of Centech, filed a separate lawsuit against Clean Air and Denny Barringer, asserting that Clean Air and Barringer defamed Wheeler in an email to the County.[3]  That lawsuit was later consolidated with the original action.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and

---

[3]    Because <u>Wheeler</u> has been consolidated with the instant case, John R. Wheeler is referred to herein as a counter-plaintiff. Clean Air and Barringer, for purposes of Wheeler's and Centech's defamation claims, are referred to as counter-defendants.

3

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.  FACTS FOR PURPOSES OF THESE MOTIONS

For purposes of the pending motions for summary judgment, and viewing the facts in the light most favorable to the non-movant, Clean Air, the following facts and reasonable inferences are accepted as true:

In 2001, after securing a $14 million federal Chemical Stockpile Emergency Preparedness Project ("CSEPP") grant, the Calhoun County Commission began to make plans related to the anticipated incineration of chemical weapons at the Anniston Army Depot.  The Commission delegated the details of the plan to Tom Sowa, the county attorney; Delois Champ, then-assistant director of the county Emergency Management Agency ("EMA"); and Barry Cox, director of the Institute for Emergency Preparedness ("IEP") at Jacksonville State University, along with Cox's staff.  Cox and the IEP were serving as consultants to the county.

The IEP assisted the County Commission in preparing a Request for Proposal ("RFP") and a Statement of Work ("SOW") relating to an emergency plan to protect county residents in the event of an accident involving the chemicals at the Anniston Army Depot.  The IEP also was responsible for assisting the County in analyzing bids made in response to the RFP and SOW.  Cox was the IEP's "lead" on the project.  Cox, Champ, and Sowa worked together closely to prepare the RFP and SOW and to analyze bids.

Clean Air is an independent distributor of commercial air products manufactured by Honeywell.  Clean Air is based in Washington state, but engages in extensive interstate business activity.  Clean Air's president and top salesman, Randall Dodd, became interested in the Calhoun County project in 2001.  He first made contact with the EMA in August of 2001, and was referred

6

to Champ.  Champ told Dodd that the project would be publicly and competitively bid in accordance with Alabama's competitive bid law.

The preparedness plan required that portable room air cleaners ("PRACs") be provided to residents of the area near the incinerator.  The project called for 10,000 PRACs to be delivered within 60 days of the date the contract was signed, and for 10,000 additional units to be delivered within 90 days of the date the contract was signed.

In October of 2002, the County sent RFPs to interested bidders and/or vendors.  On November 19, 2002, a pre-bid conference was held in Anniston.  Dodd attended on behalf of Clean Air, along with representatives from Centech.  Florence Kapoor, of Air Technology Solutions, a New Jersey distributor for Austin Air products, also attended.  Clean Air distributed PRACs supplied by Honeywell, and Austin Air manufactures Healthmate and Guardian PRACs in Buffalo, New York. At the pre-bid conference, it became apparent that Austin Air's PRACs did not meet the specifications in the RFP, and that only the Honeywell PRACs did.

On December 4, 2002, Centech and Clean Air signed a document referred to as a "Teaming Agreement."  The Teaming Agreement provided, *inter alia*, that "if [Centech] is awarded the bid and has incorporated [Clean Air's] product or pricing in its bid, [Centech] agrees to use [Clean Air] as its subcontractor in accordance with a subcontract to be negotiated in good faith, which contract shall reflect and incorporate the provisions of this agreement."  The agreement was non-exclusive, and Clean Air remained free to enter similar agreements with other prime contractor candidates.  In fact, all seven bidders for the prime contract with the County included Honeywell PRACs to be supplied by Clean Air.  The agreement also allowed Centech to include any PRAC that it chose in its bid.  In

other words, the teaming agreement did not require that Centech include Clean Air PRACs and

pricing in its bid, but, if it did, it agreed to use those PRACs "in accordance with a subcontract to

be negotiated in good faith...."

On December 6, 2002, Dodd, on behalf of Clean Air, informed the County by letter that it

would be "impossible" for Clean Air to meet the delivery deadlines for PRACs set forth in the RFP.

In material part, that letter read:

> As I became aware only today, per our conversation, because this [Honeywell PRAC] is a proprietary and unique product manufactured exclusively for the CSEPP program, the lead time form receipt of the order by Honeywell to shipment of the first PRAC is 30 days. Maximum output subsequent to commencement of manufacturing is 2,500 to 3,00 PRACs per week.

> Therefore, if the winning bidder is one of the seven companies proposing the Honeywell PRAC, it will be impossible for them to meet the SOW requirement that 10,000 units be distributed to Calhoun County residents within the action zones within 60 days after the contract is signed, because the contractor won't receive the 10,000[th] unit in Anniston until 60 days after placing the order.

> I apologize for raising this issue so late in the process. For more than a year, I had been told that production could commence within two weeks and output could reach 5,000 units per week almost immediately. However, I spoke directly with Honeywell manufacturing today and was told the actual capabilities, and notified Dr. Cox and the County immediately.

(Centech's Exhibit J).[4]

---

[4]    Clean Air asserts that the letter was intended to communicate the need to immediately receive a purchase order in order for Clean Air to comply with the delivery schedule, and that its output could exceed the delivery requirements. Even so, Clean Air does not dispute that the letter stated that the delivery requirements were "impossible" or that the County perceived the letter as a representation that the required units could not be delivered within the time designated. Indeed, the final paragraph makes clear that Clean Air was reporting an adverse change in its understanding of Honeywell's ability to manufacture the needed number of PRACs within the sixty-day delivery deadline, not simply the need for an immediate purchase order.

Bids on the project were opened on or about December 12, 2002.  Cox, Champ, and Sowa determined that Centech was the only bidder that met the requirements of the SOW and RFP, although its bid price was the highest of all that bid.  The County, however, determined that Centech's price was beyond the County's budget for the project.  The County sought advice, and the County's attorney related that, under Alabama law, in some instances a price could legally be negotiated even after the bid opening.  The County then began negotiating with Centech in an effort to reduce the price of its bid.  The County faced extreme pressure to complete the project and to get the PRACs into place quickly.  Clean Air made some adjustment to its pricing of PRACs by agreeing to less advantageous payment terms in an effort to help Centech complete the deal with the County.[5]

Through the negotiations between the County and Centech, changes also were made in the specifications for the PRACs, resulting in the issuance of addendums to the RFP, making it possible for Austin Air's PRACs to meet the specifications.  Beginning in October 2002 and continuing through February 2003, Austin Air communicated with Centech and with the County about use of its PRACs in the County project.  Austin Air attempted to convince Centech to reject the Clean Air PRACs and to instead choose the Austin Air PRACs. At a meeting on January 22, 2003, representatives of the County expressed concerned to Centech both about the price of the Clean Air PRACs and the Clean Air's ability to meet the delivery deadline.  Either later January 22 or the next day, representatives of Centech were in contact with Austin Air, seeking information about its pricing and shipping dates.  By January 23, 2003, Centech was authorized by Austin Air to act as its

---

[5]        There is a dispute as to when and to what extent Clean Air was willing to lower its price.

distributor for PRACs.  By January 30, 2003, the local project manager emailed the vice president

for contracts, Wheeler, seeking advice about how "to find a way out of buying from [Clean Air.]"

In response, Wheeler contacted Centech's attorney for a review of the non-exclusivity clause of the

teaming agreement with Clean Air.

On February 3, 2003, Wheeler forwarded a draft letter by email to Centech's local project

manager, Ron Burleson.  The draft letter was intended to be given to the County, seeking approval

to use Austin Air PRACs, rather than the Clean Air PRACs contained in the bid.  The email read in

part:

> As we discussed (over several conversations), attached is a draft letter to Tom Sowa
> seeking their approval of the new PRAC.  We need this before we take any action to
> remove [Clean Air], just in case there is any issue with the unit/County.  On that
> issue, I an waiting for a response from [Clean Air] based on my informing them
> verbally and in writing that their price is an issue and that the delivery schedule is not
> acceptable. (Verbally, their president focused on there being no other unit ever tested
> that meets the spec, so essentially why should he give any concession ... basically
> accused me in a nice way of blowing smoke about the 'other' vendor rather than the
> schedule issue.)
>      As we discussed Friday, as per our agreement with them, we are negotiating
> in good faith to solve issue to make sure we have no legal issues with them and will
> not cut them loose until Mr. Galavis is fully briefed and concurs with the decision.

(Wheeler Deposition, pp. 263-265).

That same day, February 3, 2003, Wheeler wrote another email to Burleson, saying in part:

> Also intending to draft letter of understanding with Austin Air that reflects our total
> understanding.  Will discuss with you before any action taken with either them of
> Dodd.  I think we will have a clean break with Dodd.

(Wheeler Deposition, p. 276).  Burleson responded by email, "Keep your Clean Air notes and all

correspondence just in case something blows up weeks down the road."  (Wheeler Deposition, p.

277).  While these emails were being exchanged within Centech, it was reporting to Clean Air that Clean Air remained the vendor for the PRACs under Centech's bid, and it did not inform Clean Air that it was obtaining pricing and shipping information from Austin Air.

As early as February 11, 2003, when it was reported to Wheeler that Clean Air agreed to reduce its per unit price on PRACs to $218.00, Wheeler responded tersely, "Too late."  (Wheeler Deposition, pp. 301-303).

On March 7, 2003, the County entered into a contract with Centech, awarding to Centech the job of prime contractor on the CSEPP project.  On March 8, 2003, representatives of Clean Air called Dr. Cox, seeking information about the contract negotiations because they could not get any information from Wheeler or Centech.  The contract provided that the County had the right to "direct that Centech obtain and distribute PRACs from other sources" and to make changes to the "services and/or goods to be provided."  Such clauses are known as "change order" provisions.  About that same time, Centech advised the County that the County could save money by "direct[ing]" Centech to obtain PRACs from Austin Air.  Centech wanted to avoid a lawsuit and further conflict with Clean Air by getting the County to "direct" the change, rather than to "request" it.  On March 10, 2003, Wheeler mailed a letter to Tom Sowa, stating in part:

> The direct cost to The Centech Group of the Austin Air Portable Room Air Cleaner is one hundred ninety-eight dollars per unit.  This unit has a delivery lead time of fourteen days after order.  As you know, The Centech Group's current direct cost for the Honeywell PRAC is two hundred and eighteen dollars.  In accordance with our agreement, direction by the County to supply the Austin Air unit would result in a credit of four hundred thousand dollars for additional equipment, based on the initial purchase of twenty thousand units."

11

(Wheeler Deposition, p. 329).  Over the next two days, Wheeler and County Attorney Tom Sowa exchanged drafts of a letter intended to substitute Austin Air for Clean Air as the PRAC vendor under Centech's contract.  As initially drafted by Sowa, the letter "requested" Centech make the change, but Wheeler returned a draft in which the County "directed" Centech to the make the change. (Wheeler Deposition, pp. 333-336).  Centech did not contact Clean Air about matching the Austin Air price, even though Clean Air representatives were calling to get updated information about the negotiations with the County.  Wheeler refused to return Clean Air's calls.  After Clean Air learned that Austin Air had offered to supply PRACs at a lower price, Clean Air offered to reduce its price to match the Austin Air price.

In March 2003, Cox, Champ, and Sowa made a presentation to the County relating to the advantages and disadvantages of the PRACs available through Honeywell and Austin Air.  On March 13, 2003, the County directed Centech to provide Austin Air PRACs in supplying PRACs pursuant to the contract.  On March 19, 2003, Clean Air, through Denny Barringer, sent an email to County officials stating that "Centech lied to and deceived [Clean Air] and Calhoun county right up to the final day of signing the Contract."

The Austin Air PRACs were not delivered to Anniston within the required sixty-day delivery deadline.  Indeed, some were not delivered until more than 120 days after the contract was signed.

## IV.  DISCUSSION

### A.  Centech's Motions

#### 1.  Breach of Contract

Clean Air asserts that Centech breached its Teaming Agreement.  Centech seeks summary judgment in its favor on the breach-of-contract claim, asserting that the contract is unenforceable and/or that it did not breach its duty under the contract.

Centech first argues that the contract claim is barred by Alabama's Door Closing Statute, set forth as Alabama Code § 10-2B-15.02(a), which prohibits a foreign corporation not licensed to do business in Alabama from enforcing its contracts in Alabama courts.  See, *e.g.*, Competitive Edge, Inc., v. Tony Moore Buick-GMC, Inc., 499 So. 2d 1242, 1244 (Ala. Civ. App. 1986).  This argument is without merit because an exception exists for businesses engaged in interstate commerce. Cornwall & Stevens Southeast, Inc. v. Stewart, 887 F. Supp. 1490 (M.D. Ala. 1995).  Plainly, these transactions were part of interstate commerce.

Centech next argues that the Teaming Agreement is unenforceable because it represented only an "agreement to agree," and such agreements are unenforceable as a matter of law.  See Dixieland Food Stores, Inc., v. Geddert, 505 So. 2d 371, 372-73 (Ala. 1987); Clanton v. Bains Oil Co., 417 So. 2d 149, 151 (Ala. 1982); Dumas v. First Federal Savings & Loan Ass'n, 654 F.2d 359 (5th Cir. Unit B Aug. 1981).[6]  While a portion of the Teaming Agreement called for the parties to

---

[6]         In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

negotiate "in good faith" a future subcontract for Clean Air to supply PRACs under the CSEPP contract, and while agreements to reach an agreement in the future are not enforceable,[7] the Teaming Agreement also included a present agreement to: (1) name Clean Air in its proposal, (2) "use diligent efforts" to secure county approval of the Clean Air PRACs, and (3) engage in negotiations in good faith concerning a future subcontract to supply PRACs. There is no dispute that Clean Air was identified as the supplier in Centech's bid. To the extent that the breach-of-contract claim challenges Centech's conduct in securing the County's approval and negotiating with Clean Air a subcontract to supply PRACs, the Teaming Agreement provides an enforceable contract.

While Alabama law holds that "an agreement to agree" is not an enforceable contract, it also recognizes that parties may assume a contractual duty to negotiate in good faith. See Lloyd Noland Foundation, Inc. v. City of Fairfield Healthcare Authority, 837 So. 2d 253 (Ala. 2002). The contractual obligation to negotiate in good faith is not a mere "agreement to agree"; it is a present contractual duty relating to the process and conduct by which the parties attempt to reach a future agreement. No party to such an agreement breaches it merely because no future agreement is reached, but it can be breached by a party's failure or refusal to engage in the process of negotiation in good faith.[8]

---

[7]     Defendant Clean Air asserts that the Teaming Agreement "mentions" Washington state law, but further asserts that such agreements are similarly unenforceable under Washington law. Plaintiff acknowledges that Alabama law applies; accordingly, only Alabama law is addressed herein. Defendants do not argue that the Teaming Agreement was unenforceable for want of valuable consideration. That issue is not addressed here.

[8]     In the event Washington state law applies, see Badgett v. Security State Bank, 116 Wash.2d 563, 807 P.2d 356 (1991); Keystone Land & Development Co. v. Xerox Corp., 152 Wash.2d 171, 94 P.3d 945 (Wash. 2004).

Whether Centech diligently sought approval of Clean Air PRACs and fulfilled its obligation to negotiate with Clean Air in good faith, as it agreed to do in the Teaming Agreement, is an issue of fact that must be determined by a jury. There is evidence presented that, if believed by a jury, could indicate that Centech failed to make good faith efforts to incorporate the Clean Air PRACs into the County projects, and that Centech instead sought to undermine Clean Air and to secretly support Austin Air's products.[9] There also is evidence that Clean Air told Centech that it would be unable to deliver PRACs as required, and that Centech turned to Austin Air only in response to Clean Air's failure to accommodate the County's demands regarding delivery and price. Because there exists a genuine issue of material fact, the motion for summary judgment on the breach-of-contract claim is due to be denied.

### 2.  Fraud and Suppression

Clean Air asserts that Centech fraudulently represented that it would incorporate the Clean Air PRACs into its contract with the County, that it remained "firmly committed" to working with Clean Air after the bid was submitted, and that Austin Air was "out of the picture" when in fact Austin Air was actively under consideration. Clean Air further alleges that Centech fraudulently suppressed the fact that it was involved in ongoing negotiations with Austin Air to substitute Austin Air as the supplier of PRACs. Centech seeks summary judgment in its favor on Clean Air's fraud claims on grounds that the promise made the basis of the action is a promise to do an act in the

---

[9]     To be clear, the Teaming Agreement alone did not obligate Centech to purchase Clean Air's PRACs. It did obligate it negotiate that question in good faith, and there is a genuine issue of fact concerning Centech's good faith.

future, and plaintiff cannot show any present intent to deceive.  Centech further asserts that, even if

statements that it would incorporate Clean Air PRACs into the project were false statements intended

to deceive, Clean Air still cannot recover because it did not detrimentally rely on the

misrepresentations.  Finally, Centech argues that the claim stated as a fraud claim can properly be

set forth only as a claim for breach of contract.[10]  In addition, Centech asserts that it is not liable for

suppression because it had no duty to disclose to Clean Air any fact about its negotiations with

Austin Air.

        To prevail on a fraud claim under Alabama law, a plaintiff must demonstrate that: (1) a false

representation was made by the defendant (2) concerning a present material fact (3) upon which the

plaintiff relied to its detriment.  See Liberty National Life Ins. Co. v. Ingram, 887 So. 2d 222 (Ala.

2004); see generally Ala. Code § 6-5-101(1975).[11]  To be actionable as fraud, a statement must be

an "affirmative statement or misrepresentation."  Kaye v. Pawnee Construction Co., 680 F.2d 1360,

1366 (11th Cir. 1982)(applying Alabama law).  Furthermore, "an actionable misrepresentation must

be of a present fact."  Sly v. First National Bank, 387 So. 2d 198, 200 (Ala. 1980).  Generally, a

_____

[10]        This argument is unavailing.  While it is true that a plaintiff cannot recover on both
a fraud claim and a breach-of-contract claim where the claims are inconsistent, and that a plaintiff
cannot receive a double recovery for such claims, Alabama law does recognize that
misrepresentations or deception may in some circumstances give rise to both a contract action and
a tort claim.  See, e.g., Dickinson v. Land Developers Construction Co., Inc., 882 So. 2d 291 (Ala.
2003).

[11]        To be liable for a claim of fraudulent suppression under Alabama law, the plaintiff
further must demonstrate that the defendant had a duty to disclose the allegedly suppressed fact.  See,
e.g., Flowers v. Ford Motor Credit Co., 959 F. Supp. 1467 (M.D. Ala. 1997).  It is argued here that
Centech had no such duty; but, because the court finds that the plaintiff has failed to show that it
detrimentally relied, we need not address whether there exists such a duty between these parties
under Alabama law.

claim of fraud cannot be based upon the defendant's expression of an opinion or a prediction of future events.  See, e.g., Wade v. Chase Manhattan Mortgage Corp., 994 F. Supp. 1369, 1378-79 (N.D. Ala. 1997), aff'd, 132 F.3d 1461 (11th Cir. 1997).  Such opinions or predictions simply are not statements of existing fact upon which individuals have the right to rely.  Crowne Investments, Inc. v. Bryant, 638 So. 2d 873, 877 (Ala. 1994).

Similarly, claims that a party has misrepresented its "promise to act or not to act in the future" is deemed to be a promissory fraud.   A claim of promissory fraud must be supported by proof of two additional elements: (1) that the defendant had no intention at the time of the promise of performing the act promised, and (2) that the defendant had an intention to deceive.  See Ex parte Michelin North America, Inc., 795 So. 2d 674, 678-79 (Ala. 2001).  The failure to perform a promised act is not in itself evidence that the actor intended to deceive at the time of the promise. See Campbell v. Naman's Catering Inc., 842 So. 2d 654 (Ala. 2002).  Otherwise, "any breach of contract would constitute a fraud."  Goodyear Tire & Rubber Co. v. Washington, 719 So. 2d 774, 776 (Ala. 1998).  Moreover, comments that qualify as opinions or mere "puffing" do not amount to fraud.  BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203, 217 (Ala. 2001).   While misrepresentations are actionable as fraud in many contexts, it is well settled that a party to a contract "cannot convert the mere failure to perform or to fulfill a contractual promise into a fraud claim." Dickinson v. Land Developers Construction Co., Inc., 882 So. 2d 291, 303 (Ala. 2003)(Houston, J. concurring).

In the instant case, Clean Air claims that Centech misrepresented and suppressed material facts about whether Clean Air PRACs would be used if Centech were awarded the bid on the County

project and about the status of the Austin Air negotiations.  The claim that Centech misrepresented its intention to represent Clean Air's best interests in negotiations with the County is merely a breach-of-contract claim recast as a fraud claim.  For this reason alone, summary judgment is due to be granted in favor of Centech on the fraud claim arising from Centech's conduct in negotiating with the County.

Centech is entitled to summary judgment in its favor on the same fraud claim for the additional reason that the claim set forth in the complaint regarding Clean Air's intention to negotiate in good faith is one of promissory fraud, turning on a promise to act in the future, and must fail absent any showing of a present intent to deceive.  While Clean Air may be able to offer compelling evidence that Centech undermined Clean Air's products in later negotiations with the County, Clean Air has not offered any evidence that Centech, *at the time it made the promise* to use Clean Air as a supplier, had any intention to choose Austin Air or any other supplier.  Indeed, the undisputed evidence shows that on December 4, 2002, when the Teaming Agreement was formed, Clean Air's Honeywell PRACs were the only PRACs that met the specification of the RFP and SOW.  There would have been no reason for Centech to be deceitful on that date.  Accordingly, the fraud claim related to the "good faith intentions" is due to be dismissed.

Plaintiff's remaining fraud-based claims are that Centech failed to disclose facts about the role of Austin Air in the negotiations, that Centech fraudulently misrepresented that it was firmly committed to Clean Air, and that Austin Air was "out of the picture."  Under Alabama law, one element of any claim of either suppression or active fraud is that the plaintiff acted in reliance to its detriment.  See Flowers, 959 F. Supp at 1470.  Centech argues that Clean Air did not detrimentally

18

rely on any representation or suppression allegedly made by Centech.  In response, plaintiff's counsel asserts simply that Clean Air would not have expended the time, energy, or effort toward being included as a subcontractor in the County project had it known all the facts.  The court is persuaded that Clean Air has failed to demonstrate that it was injured by the alleged fraud or suppression. Clean Air has not demonstrated that it would not have expended time, energy, or effort to be chosen as the PRAC supplier: to the contrary, it is clear that the estimated $1.7 million in profits that could have been realized had Clean Air become the subcontractor for PRACs was ample incentive for Clean Air to continue to attempt to gain the business available from the County project.  Clean Air has not provided any evidence that it would not have attempted to compete for the business had it known that Centech and Austin Air were working to obtain the business without including Clean Air.  There is no deposition testimony or affidavit testimony suggesting that Clean Air would have withdrawn from the competition had it know the true facts.  Indeed, there is some evidence that Clean Air was aware that "other vendors" of PRACs were involved, yet it continued to press Centech for the business to the very end.  Accordingly, Clean Air has failed to show that it has evidence of detrimental reliance, and Centech's motion on the fraud and suppression claims is due to be granted for this additional reason.


### 3.  Defamation (Counterclaim)

Centech has filed a counterclaim against Clean Air, asserting that Clean Air, through Denny Barringer, stated to County officials that Centech "lied to and deceived [Clean Air] and Calhoun County right up to the final days of signing the Contract."  The same claim is asserted against Clean

Air by Wheeler.  Centech and Wheeler assert that the statement constitutes defamation under Alabama law.

To establish a defamation claim under Alabama law, a plaintiff must demonstrate: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence, and, (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication of the statement."  Drill Parts & Services Co. v. Joy Mfg. Co., 619 So. 2d 1280, 1289 (Ala. 1993)(internal citations and markings omitted).  As implied by the first element, there is no action if the alleged defamatory statement is truthful.

As discussed more fully *supra*, Clean Air has offered evidence that, if believed, could lead a reasonable juror to find that Centech misled Clean Air about the status of the PRACs order and about its negotiations with the County.  If the statement by Clean Air that Centech was deceitful is true, it cannot be the basis for an action for defamation.  Clean Air has created a jury question as to whether the statement is false; accordingly, neither Centech nor Wheeler is entitled to summary judgment on the counterclaim, and the motion as to the defamation claim therefore is due to be denied.

**B.  Austin Air's Motions**

Clean Air complains that Austin Air approached the County and Centech, and aggressively competed to have the County use its PRACs in place of those manufactured by Honeywell.  Austin Air's conduct, Clean Air asserts, constitutes tortious interference with Clean Air's business

20

relationship with Centech.  Austin Air seeks summary judgment in its favor on grounds that its actions were legally justified.

There is no substantive dispute as to whether Austin Air sought to win the business that might otherwise have gone to Clean Air.  The elements of a claim for tortious interference have been discussed *supra*.  Austin Air argues that the Alabama Supreme Court has long recognized that, when a business engages in "lawful competition" to win a marketplace advantage, "even though carried to the extent of ruining a rival," its actions are justifiable interference in the rival's business relations, and are not actionable "so long as [the actions are] carried on in furtherance of one's own interests." Beasley-Bennett Electric Co. v. Gulf Coast Chapter of National Electrical Contractors Ass'n, 134 So. 2d 427 (1961).  The absence of such a justification often has been cited as an element of the tort, but has come to be recognized as an affirmative defense to be pleaded and proved by the defendant. See Parsons v. Aaron, 849 So. 2d 932, 946 (Ala. 2002)(adopting the elements as stated in § 767, Restatement (Second) of Torts (1977)).   See also BellSouth Mobility, 814 So. 2d at 212 n.5 (requiring the defendant to plead and prove justification).  In addition, Alabama courts have adopted § 768 of the Restatement of Torts, further noting that a competitor's efforts to win business are not actionable interference unless wrongful means are employed.  Soap Co. v. Echolab, Inc., 646 So. 2d 1366 (Ala. 1994)(accepting a definition of wrongful means as physical violence, fraud, and civil or criminal prosecutions.

In the instant case, Austin Air clearly sought to have its PRACs considered by the County even though they had not been included in any bid.  Whether the County acted properly by considering Austin Air's overtures after the bidding process was completed may be another issue for

another day, but it is not an issue in dispute in this case.  There is no viable contention in plaintiff's response that the actions of Austin Air were "wrongful" so as to constitute tortious interference. Clean Air's assertion that, because Austin Air PRACs were not included in any bid, Austin Air cannot be deemed a "competitor" is without basis.  Clearly, both Clean Air and Austin Air sold PRACs and sought the same customers — entities that wished to buy PRACs.  The undisputed facts at this juncture show that Austin Air was justified by a competitor's privilege, and its motion for summary judgment on plaintiff's sole claim against it is due to be granted.

## V.  CONCLUSION

Based upon the foregoing undisputed facts and legal conclusions, the motions for summary judgment filed by defendant Centech (court documents 89, 90, and 123 in 1:03-cv-944-TMP) are due to be DENIED IN PART AND GRANTED IN PART.   There are genuine issues of material fact that preclude summary judgment as to plaintiff Clean Air's breach-of-contract action, but its fraud, deceit, and suppression claims are due to be DISMISSED WITH PREJUDICE.

The motions for summary judgment filed by counter-plaintiff Wheeler (court documents 23, 24, and 60 in 1:04-cv-1179-TMP) are due to be DENIED.

The motions for summary judgment filed by defendant Austin Air (court document 103 in 1:03-cv-944-TMP and 37 in 1:04-cv-1179-TMP) are due to be GRANTED.  Additionally, Austin Air's cross-claims against Centech and Calhoun County, Alabama, are due to be DISMISSED WITH PREJUDICE.

The motions for summary judgment filed by Calhoun County (court document 117 in 1:03-cv-944-TMP and 51 in 1:04-cv-1179-TMP) are deemed MOOT.

A separate order will be entered herewith granting and denying the motions as described.

DATED the 31ST  day of March, 2006.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE